Devin Bolton (SBN 290037)
  dbolton@weitzlux.com
**WEITZ & LUXENBERG, PC**
1880 Century Park East, Suite 700
Los Angeles, CA 90067
Phone: (212) 558-5552
Fax:    (212) 344-5461

[Additional Attorneys for Plaintiff Listed on Back Cover]

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| WILLIAM FLEMMING and DEVIN ROSE, individually and on behalf of all others similarly situated, | Civil Action No.: |
| Plaintiffs,<br>v. | **CLASS ACTION COMPLAINT FOR DAMAGES** |
| GOOGLE LLC and YOUTUBE, LLC, | |
| Defendants. | **DEMAND FOR JURY TRIAL** |

Plaintiffs William Flemming and Devin Rose, individually and on behalf of all others similarly situated, bring this Class Action Complaint against Defendants Google LLC ("Google"), and YouTube, LLC ("YouTube"), and make the following allegations based upon information and belief, except as to allegations specifically pertaining to Plaintiffs, which are based on personal knowledge.

## NATURE OF THE ACTION

1.    YouTube is one of the most popular free streaming video platforms in the world, offering billions of videos on nearly every subject matter imaginable.

2.    Because the platform is free, however, viewers are bombarded with advertisements displayed while streaming video content. Some videos are interrupted every few minutes with advertisements lasting 30 seconds or longer that cannot be skipped. And even when the ads are skippable, they require manual action to get back to the content.

3.      To avoid this annoyance and barrage of constant interruption, YouTube offers a paid streaming subscription called YouTube Premium, which promises members an escape from the constant, never-ending ads and interruptions.

4.      YouTube Premium is a paid monthly subscription service with a simple value proposition: for a fee, members are offered a streaming experience that is "ad-free" with "no interruptions" during streamed content.

5.      But this promise is hollow. YouTube Premium does not offer an "ad-free" and "uninterrupted" experience. To the contrary, advertisements and interruptions frequently appear during streamed content, interrupting videos with commercials for everything from popular automobiles to marketing for local attorneys or dietary supplements.

6.      Below is an example of one such advertisement and interruption. The video podcast is interrupted by a one-minute segment, titled "Ads," which contains a commercial for a company and product unrelated to the video.



7. Thus, YouTube Premium fails to provide the service that its members bargained for—an ad-free experience with no interruptions.

8. Plaintiffs are YouTube Premium members who relied on YouTube's representations that Premium was "ad-free" and that it would provide video content with no interruptions. Through this suit, Plaintiffs seek to put a stop to YouTube's misrepresentations and/or omissions and to remedy the loss of their benefit of the bargain.

## PARTIES

9. Plaintiff William Flemming is a citizen of the State of California and resides in San Bernardino County, where he intends to remain.

10. Plaintiff Devin Rose is a citizen of the State of California and resides in Ventura County, where he intends to remain.

11. Defendant Google LLC is a Delaware limited liability company with its principal place of business located in Mountain View, California. Google regularly conducts and transacts business in this District and throughout the United States.

12. Defendant YouTube, LLC is a Delaware limited liability company with its principal place of business in San Bruno, California. YouTube is a wholly-owned subsidiary of Google. YouTube is widely available to consumers throughout the United States.

13. YouTube provides the YouTube Premium service through Google.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action in which the matter in controversy exceeds $5,000,000 exclusive of interest and costs, and members of the putative Class are citizens of a state that is different from the state in which Defendants are citizens. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

15. This Court has personal jurisdiction over Defendants because their principal place of business is in California, and/or because they have contacts with California that are so continuous and systematic that they are essentially at home in this state. Defendants regularly conduct and

solicit business in California, provide products and/or services by or to persons in the State of California, and derive substantial revenue from the same.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' and the Class members' claims occurred in this District, and Defendants are subject to the Court's personal jurisdiction.

17. Venue is proper pursuant to the YouTube Terms of Service (the "Standard Terms"), which state in relevant part:

> All claims arising out of or relating to these terms or the Service will be governed by California law, except California's conflict of laws rules, and will be litigated exclusively in the federal or state courts of Santa Clara County, California, USA. You and YouTube consent to personal jurisdiction in those courts.

## BACKGROUND FACTS

### A) YouTube's History and Business Model

18. YouTube is a video streaming platform that allows viewers to post and consume hours of content about virtually every topic imaginable. While YouTube is free for viewers to stream, it monetizes these viewers through various forms of advertisements that appear on its platform.

19. In December 2005, a group of design experts and computer scientists created YouTube and launched the product for public use.

20. Google recognized YouTube's huge profit potential and in 2006, just one year after its launch, Google acquired YouTube for more than $1.65 billion in Google stock.

21. In 2005 and most of 2006, YouTube was entirely free of advertisements.

22. In 2007, YouTube first introduced banner ads that popped up on the bottom 20% of the screen and disappeared after 10 seconds.

23. In late 2008, YouTube introduced pre-roll ads—ads that played before videos began.

24. By 2008 and 2009, YouTube was primarily generating revenue by selling advertisements. This has continued ever since.

COMPLAINT FOR DAMAGES

25. Around the same time, YouTube began to use algorithms to maximize how long viewers spent watching YouTube videos. The longer a viewer spends on the platform, the more ads the viewer sees. And the more ads the viewer sees, the more money YouTube makes.

26. But YouTube did not stop with disappearing banner ads and pre-roll ads. In 2012, it introduced mid-roll ads—ads that interrupt the flow of the content and play in the midst of the video being streamed.

27. By 2012, YouTube viewers were watching close to four billion hours of video every month. However, each viewer was only spending an average of fifteen minutes per day on the platform. Viewers navigated to YouTube with specific video content in mind, and after watching that content, they typically left the platform.

28. In order to further increase revenue, company management set a goal to increase daily watch time to one billion hours. Again, more watch time equals more ads shown, and more ads shown equals more money for YouTube.

29. Google executives decided that the best way to keep viewers on the site was to recommend videos that would autoplay directly after the prior video finished. The autoplay design change was a resounding success, significantly increasing the platform's daily watch time per viewer.

30. YouTube engineers adjusted the algorithm to make it more successful over time. By 2018, YouTube Chief Product Officer Neal Mohan claimed that the YouTube algorithm's recommendations were responsible for more than 70% of the time viewers spent on the platform.

31. In 2021, YouTube made post-roll ads—ads that appear at the end of videos—the default for certain videos longer than 10 minutes.

32. Today, YouTube is the number one streaming service in the United States and hosts over 8 billion streaming videos.

33. According to YouTube, over 20 million videos are uploaded to the platform per day. Approximately 500 hours of video are uploaded on the platform every minute.

34. All told, YouTube is the second most visited website in the world.

COMPLAINT FOR DAMAGES

35. The range of content hosted on YouTube is vast. Viewers can stream millions of songs, podcasts, movies, and videos uploaded by creators and influencers.

36. YouTube allows viewers to search for specific video and/or audio content. It also employs a powerful algorithm that exploits detailed user information to target each individual user with hours upon hours of videos (and ads) recommended by YouTube.

37. There are also over 113 million YouTube "channels," each of which is a homepage for a personal account. Individuals, content creators, and businesses create channels to upload videos and/or curated playlists.

38. For example, the popular entertainer Mr. Beast is the most subscribed-to YouTube channel, with over 490 million subscribers. Podcaster Joe Rogan's channel has over 21 million subscribers. Pop star Taylor Swift's YouTube channel has over 63 million subscribers. Each of these channels hosts the creator's original content, as well as content curated by the channel.

**B) YouTube YouTube's Advertisements**

39. In 2025, YouTube generated approximately $40.4 billion in ad revenue. That's more ad revenue than YouTube's next four streaming competitors—Disney, NBC, Paramount, and Warner Bros. Discovery—combined.

40. Viewers regularly report that they dislike YouTube's ads, both because they interrupt content and appear at a seemingly constant clip.

41. Many viewers have attempted to install ad blockers to alleviate these interruptions. But YouTube has implemented mechanisms to detect and forbid ad-blocking software. If a viewer has an ad-blocker enabled, YouTube will not allow its videos to be played until the ad-blocker has been disabled. This forces viewers to endure advertisements if they wish to see YouTube content for free.

42. The ad experience on YouTube has led many viewers to look for ad-free options, or options with fewer advertisements.

43. YouTube has attempted to satisfy this demand. In 2014, the platform launched its first paid subscription service called Music Key, offering ad-free music streaming.

COMPLAINT FOR DAMAGES

44. In 2015, Music Key was renamed to YouTube Red, offering ad-free music and videos to paid subscribers.

### C) YouTube Premium

45. In June 2018, YouTube launched YouTube Premium, which purported to provide ad-free streaming of videos and music. This service was available to new members for $11.99 per month.

46. Over time, the cost of YouTube Premium has increased. In 2023, the price increased to $13.99 per month. In 2026, the price increased to $15.99 per month.

47. In 2021, YouTube launched YouTube Premium Lite as a pilot test in certain European markets. The concept was to provide a streaming experience with fewer ads than the standard free service at a price that was discounted from the Premium price. In March 2025, YouTube rolled out Premium Lite in the United States, charging $7.99 per month for what it described as a "more affordable way to enjoy most videos on YouTube ad-free." In other words, Premium Lite promised a lower monthly fee than its Premium counterpart, but Lite members would be subjected to some advertising.

### D) YouTube Premium's Misrepresentations

48. YouTube Premium currently has over 125 million subscribers, or members.

49. YouTube Premium members pay a monthly fee of $15.99 in exchange for a streaming service that is marketed and billed as "ad-free" and with "no interruptions."

50. Indeed, when a viewer attempts to sign up for YouTube Premium, a YouTube screen displays information stating that the service is "Ad-free" with "No interruptions" prominently featured in bold, large font.



51. This message: "Ad-free" and "No interruptions" is reinforced again and again across YouTube's pages that describe and tout its Premium service.

52. YouTube further represents that Premium lets members view "Unlimited ad-free videos" so they can "Immerse in more of [their] favorite videos without waiting for ads."

COMPLAINT FOR DAMAGES



**Keep playing what you love— uninterrupted**

**Unlimited ad-free videos**

Immerse in more of your favorite videos without waiting for ads. Find helpful how-to's, try new recipes, or work out with your favorite creators — all without any interruptions.

53.     These representations—"ad-free" and "no interruptions"—are unambiguous, unqualified, and appear on the very first pages that a prospective Premium member sees after clicking the YouTube Premium link to explore membership options.

54.     On the sign-up webpage for Premium, YouTube draws a sharp line between Premium and Premium Lite. For Premium Lite, YouTube promises that "Most videos are ad-free," while for Premium, it promises "No ads" on *all* YouTube videos.

55.     YouTube even provides viewers with an easy-to-use graphic comparing the benefits—including the ad-free benefits—of YouTube Premium and YouTube Premium Lite.

COMPLAINT FOR DAMAGES

56.    The FAQ on the Premium sign-up page reinforces the promise: "Premium is all of YouTube and YouTube Music ad-free, offline, and in the background. Enjoy every Premium feature across all content types." YouTube further promises that "YouTube Premium offers an ad-free experience across all of YouTube."

57.    A reasonable consumer would understand YouTube's representations to mean that in exchange for monthly subscription payments, YouTube Premium will contain no ads and no interruptions. In comparison, a reasonable consumer would understand that in exchange for a lesser monthly subscription payment, YouTube Premium Lite would display limited ads in some streaming content. Viewers can therefore choose a product based on their price and advertising sensitivities. Or so they are led to believe.

58.    YouTube Premium's Terms of Service ("Premium Terms") further reinforce the representation that Premium will not have ads or interruptions.

59.    The Premium Terms contain only one reference to ads, stating, "For clarity, ads or promotions may appear during live events streamed on YouTube, such as sporting events." The

Premium Terms do not state that YouTube Premium will contain some advertisements and interruptions.

60.    A reasonable consumer viewing YouTube's representations would believe that in exchange for the monthly fees charged, Premium offers an ad-free experience without interruptions.

**E) YouTube Premium Has Ads**

61.    Contrary to YouTube's representations, videos streamed on YouTube Premium are littered with ads. These ads often have nothing to do with the streaming content at all.

62.    This includes ads for everything from insurance companies to dietary supplements to new models of vehicles for purchase. Ads appear both before and during video content, interrupting content flow just as they do on YouTube Premium Lite and standard YouTube.

63.    For example, a popular content creator and podcaster, Theo Von, included an advertisement for Pepsi in the midst of his podcast interview with Kevin James, a prominent actor and comedian. Theo Von spends the first 23 minutes of the video interviewing Kevin James. The content is not about Pepsi, Super Bowl commercials, or polar bears. But at 23 minutes and 24 seconds elapsed, the video cuts away from the interview with Kevin James to an advertisement for Pepsi. This advertisement replays Pepsi's Super Bowl commercial, where a polar bear performs a blind taste test comparing Pepsi and Coca-Cola.



64.    In the above screenshot, the red YouTube play button with the word "Premium" next to it in the top left corner indicates that video is being viewed within YouTube Premium's paid service.

65.    In this example, it is not until approximately three minutes later, at 26 minutes and 18 seconds elapsed, that Theo Von's interview with Kevin James resumes. The Pepsi advertisement and commercial are completely unrelated to the interview with Kevin James.

66.    Another example of an ad within YouTube Premium appears in a video posted by Kallmekris, a popular YouTube channel where the creator discusses true crime stories. For the first 46 minutes of the video, the content creator discusses the true crime story, but at 46 minutes 14 seconds elapsed, the content transitions away from the true crime story and shifts to a video advertisement for a company called Surfshark, which offers a VPN service and a web content blocker.

COMPLAINT FOR DAMAGES



67.    In this example, it is not until over one minute later, at 47 minutes and 25 seconds elapsed, that the true crime story resumes. The true crime story is about a serial killer and is completely unrelated to Surfshark, VPN services, or web content blockers.

68.    Some ads within YouTube Premium appear within just the first several seconds of the video.

69.    For example, a popular gaming channel called Markiplier, posted a video where the content creator plays Endoparasitic 2, a survival game. Just 10 seconds into the 50-minute video, the video contains an advertisement for a company called NordVPN, which offers a VPN service. After an approximately one-minute video advertisement for NordVPN, the video transitions back to the Endoparasitic 2 gameplay, which has nothing to do with NordVPN or VPN services.



70.    One of YouTube's popular content creators, The Diary Of A CEO, acknowledges that such advertisements are not part of the expected content, so he labels these segments "Ads."



71.    In this example, the video shifts away from an interview with Neil deGrasse Tyson and transitions to a video advertisement for an ekster travel pack, which is completely unrelated to the interview.

72.    These are just a few examples, but there are numerous other examples of video advertisements within YouTube Premium.

73.    At all relevant times that YouTube marketed and sold the YouTube Premium service, YouTube knew or should have known about the advertisements discussed above that are within YouTube Premium.

74.    In summary, YouTube Premium members pay over $15 per month for a streaming service that is touted as "ad-free." The service they are receiving, however, is full of ads that appear during streamed videos.

*F) YouTube's Help Center*

75.    YouTube's Help Center publishes an article which attempts to justify the presence of ads in YouTube Premium. To get there, a consumer must follow a winding path to an entirely separate webpage—three links deep and under a drop-down menu with the misleading heading "Watch videos without ads." There, the consumer will find YouTube's statement that Premium members "may still see branding or promotions embedded in the content by the creator [of each video], as well as promotional links, shelves and features in and around content that are added or enabled by the creator. These links, shelves and features could be for their website, merchandise, membership or their channel, event tickets, or other related destinations that they are promoting."

*i) The Help Center article is not part of YouTube Premium's Terms of Service*

76.    To find this language, a consumer must leave the Premium Terms and navigate to a completely different site called "YouTube Help."

77.    Here's how: The consumer starts with YouTube's Standard Terms of Service. The consumer must click the hyperlink for "Paid Service Terms of Service." The consumer must then click the hyperlink for "Additional Terms for YouTube Premium, YouTube Music Premium and YouTube Premium Lite (and accepted payment methods)" to access the Premium Terms. Section 7 of the Premium Terms is titled "Features" and contains a hyperlink. If a viewer clicks the word "Features," they are directed to a different website named "YouTube Help" and an article titled "Use your YouTube Premium benefits."



78.     The YouTube Help page contains a three-minute video that discusses how to sign up for YouTube Premium, the different YouTube Premium plans, and the benefits of each plan.

79.     In the video, YouTube again promises that YouTube Premium will be an "ad-free experience" with "uninterrupted viewing." The video reinforces a reasonable consumer's expectation from YouTube's marketing, representations, and Terms that YouTube Premium will not have any ads or interruptions.

80.     If a consumer clicks on the heading that states "Watch videos without ads," a drop down menu appears that reads as follows:

**Watch videos without ads** ⌃

With **YouTube Premium**, you can watch millions of videos without interruptions by ads before and during a video. You will also not see third-party banner ads and search ads.

You may still see branding or promotions embedded in the content by the creator, as well as promotional links, shelves and features in and around the content that are added or enabled by the creator. These links, shelves and features could be for their website, merchandise, membership to their channel, event tickets, or other related destinations that they are promoting. Ads or promotions may also appear on Primetime Channels, during live events streamed on YouTube, such as sporting events.

Ad-free videos are supported across all devices and platforms with access to YouTube—including on compatible smart TVs/gaming consoles and the YouTube, YouTube Music, and YouTube Kids mobile apps, if they're available in your location.

**YouTube Music Premium** offers a similar experience, allowing you to enjoy music content in the YouTube Music app without ads.

81.    At the bottom of the YouTube Help page, there is a second video.



Sign up to enjoy Premium benefits

To enjoy Premium benefits, sign up at youtube.com/premium/inapp ⧉ .

Subscribe to the YouTube Viewers channel ⧉ for the latest news, updates, and tips.

**Note:** YouTube TV, Primetime channels, channel memberships, and NFL Sunday Ticket are not included in YouTube Premium or Music Premium benefits.

⚠ Give feedback about this article

18
COMPLAINT FOR DAMAGES

82. The second video on the YouTube Help page reiterates YouTube Premium's core value proposition—that it is "ad free."

83. Not only is the YouTube Help page an entirely different website, but it is not part of the Premium Terms that a consumer accepts when purchasing YouTube Premium.

84. Section 1 of the Premium Terms expressly define the scope of the provisions incorporated therein: "Your purchase of any Premium Service and any use of the Premium Services are subject to: these Premium Service Terms;  these Paid Service Terms of Service; and the YouTube Terms of Service [*i.e.*, the Standard Terms]. We'll refer to these documents together as the 'Terms'."

85. The Standard Terms further clarify that scope: "Your use of the Service is subject to these terms, the YouTube Community Guidelines and the Policy, Safety and Copyright Policies which may be updated from time to time (together, this 'Agreement')."

86. Notably absent is any discussion of YouTube Help. Neither the Standard Terms, nor the Premium Terms, incorporate YouTube Help into the agreement that a consumer accepts when enrolling in YouTube Premium.

87. YouTube drives that point home: "Any other links or references provided in these terms are for informational use only and ***are not part of the Agreement***." (Emphasis added.)

88. As a hyperlink within the Premium Terms, the YouTube Help page, including the "Use your YouTube Premium benefits" article, is ***not*** part of the Premium Terms.

89. At no point does YouTube state in its marketing materials, the Premium Terms, or the YouTube Premium Help page that Premium members will still see some ads and interruptions.

*ii) The Help Center article explains that members may see promotions, but not ads.*

90. Once the consumer arrives at the "Use your YouTube Premium benefits" article, they encounter the following explanation:

> With YouTube Premium, you can watch millions of videos without interruptions by ads before and during a video. You will also not see third-party banner ads and search ads.

> You may still see branding or promotions embedded in the content by the creator, as well as promotional links, shelves and features in and around the content that are added or enabled by the creator. These links, shelves and features could be for their website, merchandise,

19

COMPLAINT FOR DAMAGES

membership to their channel, event tickets, or other related destinations that they are promoting. Ads or promotions may also appear on Primetime Channels, during live events streamed on YouTube, such as sporting events.

91.     The YouTube Help article thus uses terms—branding, promotions, promotional links, shelves, and features (collectively, "Promotions")—which have a specific meaning to consumers.

92.     By using these distinct terms, YouTube attempts to draw a distinction between "ads" and Promotions. Accordingly, a reasonable consumer would understand that Promotions are something other than an "ad."

93.     For example, one popular content creator named Logan Paul has a podcast channel named "IMPAULSIVE." Logan Paul is also an owner of Prime, a sports drink brand, and Lunchly, a grab-and-go meal kit brand. In the IMPAULSIVE video podcasts, Logan Paul includes branding by staging his Prime drinks and Lunchly meal kits around the speakers in his videos.



94.    In another example, popular Do-It-Yourself channel "HomeRenoVisionDIY" self-promotes a related series of videos, titled "Forever Home Renovation Series," and invites viewers to subscribe to the channel.



95.    Other creators, such as Taylor Swift, include promotional links in the description box below their videos, including links to her own website, music, merchandise store, and social media accounts.

COMPLAINT FOR DAMAGES



COMPLAINT FOR DAMAGES

96.    Taylor Swift also utilizes YouTube's product shelf feature, which appears below videos, to promote her online store. One of her product shelves is entitled "Shop the Taylor Swift store." The shelf previews a few items that can be purchased from Taylor Swift's online store. Viewers can click on the products displayed on the shelf, which will take them to the page where the product can be purchased from Taylor Swift's online store.



97.    Assuming, *arguendo*, that YouTube Help is properly part of the Premium Terms, and that there is a difference between an "ad" and a Promotion, YouTube attempts to disclose that Promotions may be included in videos on YouTube Premium, and disclaim Promotions from its representations that YouTube Premium is "ad-free."

98.    Importantly, however, YouTube Help does **not** disclaim ads. Thus, consumers would only expect to see Promotions while watching videos on YouTube Premium. Consumers would not expect to see ads.

*iii) Interpreting Promotions to include "ads" violates the Premium value proposition.*

99.    Yet, YouTube Premium members are still shown ads while watching videos. This violates the very value proposition upon which YouTube Premium is based: consumers are willing to pay money to avoid the barrage of advertisements to which they would be otherwise be subjected in the free version of YouTube.

100.    YouTube violates that value proposition if it permits advertisements under the guise of a Promotion. YouTube Premium members expect to receive what they are promised and what they pay for—an "ad-free" experience.

101.    Consumers are deceived if YouTube advertises and sells the Premium service as "ad-free," yet simply re-defines advertisements under a new name—Promotions—without disclosing this in the Premium Terms, or even in YouTube Help. This is simply word games and double talk.

102.    Regardless of whether the ad is placed within the video by YouTube or the content creator—the user experience is the same—they are still subjected to annoying ads after paying YouTube to enjoy video content "ad-free."

103.    If YouTube Premium members were agreeable to paying for a service with some ads, then they would have subscribed to Premium Lite and paid a lower monthly fee, but they expressly contracted for an "ad-free" service. YouTube Premium does not deliver such service, contrary to its express representations.

104.    YouTube could prevent its Premium members from being forced to sit through ads placed by its content creators, yet YouTube has failed or refused to take steps to eliminate such ads from the viewing experience of its Premium members.

*G) YouTube Premium Has Interruptions*

105.    No matter how YouTube characterizes it—whether an ad or a Promotion—the video is nevertheless interrupted.

106.    In each of the examples mentioned above, the expected video content pauses, transitions to new content attempting to sell a product or service, and then transitions back to the content of the video.

107.    Often there are both visual and audio cues that demonstrate the interruption.

108.    Sometimes the video will include a transition slide before and after the interrupting ad.

109.    Sometimes the video will include a sound effect that signifies the interruption of the advertisement, such as the sound of flipping the page of a book.

110.    In the above example from Kallmekris, the content creator creates a cliffhanger at a critical point in the plot and says "we will get to that soon" before transitioning to the advertisement for Surfshark. After the conclusion of the ad, the creator states "And let's get back to it" before returning to the plot.

111.    Some videos include a loading bar at the bottom of the interruption that moves from the left portion of the screen to the right portion of the screen, serving as a visual cue to show viewers when the regular and expected programming will resume.

112.    Some videos even label these distinct and interrupting segments of their videos, recognizing that they are interruptions.

113.    At all relevant times that YouTube marketed and sold the YouTube Premium service, YouTube knew or should have known about YouTube Premium contained interruptions—irrespective of whether such interruptions are coined an "ad" or a Promotion.

114.    And, YouTube advertised and sold—and continues to advertise and sell—Premium as having "no interruptions."

*H) Plaintiffs' Experiences*

115.    Plaintiff William Flemming has been a YouTube Premium member since 2019.

116. On average, Mr. Flemming watches or listens to approximately six hours of YouTube Premium per day.

117. Although he bargained for an experience in which video would not be interrupted by ads, Mr. Flemming is subjected to advertising constantly.

118. Just in the last week alone, videos he has viewed have been interrupted by ads from the dollarwise app, various gaming apps, and a service called Incogni. These are just examples.

119. Mr. Flemming paid for an "ad-free" experience with no interruptions and would like to watch videos on YouTube without experiencing ads that interrupt his video stream.

120. Plaintiff Devin Rose has been a YouTube Premium subscriber since 2018.

121. Mr. Rose subscribed to YouTube Premium so that he could obtain a YouTube experience without advertisements interrupting the video stream.

122. Mr. Rose did not receive what he bargained for; instead, he is commonly subjected to advertisements both before and during the videos that he streams while watching and/or listening to YouTube.

123. Mr. Rose has paid for an "ad-free" experience and would like to listen and watch videos on YouTube without experiencing ads that interrupt his video stream.

## CLASS ALLEGATIONS

124. Plaintiffs bring this action individually and on behalf of all others similarly situated. The proposed classes are defined as:

**Nationwide Class:**

All adult persons in the United States who, during the applicable limitations period, subscribed to YouTube Premium for one or more months under the reasonable (but mistaken) belief that in exchange for monthly subscription fees, they would receive an "ad-free" and "uninterrupted" experience.

**California Class:**

All adult persons residing in the State of California who, during the applicable limitations period, subscribed to YouTube Premium for one or more months under the reasonable (but mistaken) belief that in exchange for monthly subscription fees,

26

they would receive an "ad-free" and "uninterrupted" experience.

125. The Nationwide Class and California Class are collectively referred to herein as the "Classes."

126. Excluded from the Classes are Defendants, their subsidiaries and affiliates, officers, directors, the members of their immediate families, and any entity in which any Defendant has a controlling interest, to include the legal representatives, heirs, successors, or assigns of any such excluded party. Also excluded are the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

127. Plaintiffs reserve the right to modify or amend the definition of the proposed Classes if necessary, before this Court determines whether certification is appropriate.

128. This case is properly brought as a class action under Fed. R. Civ. P. 23(b)(2) and (b)(3) and all requirements are met for the reasons set forth in the following paragraphs.

129. *Numerosity*. The members of the Classes are so numerous that separate joinder of each member is impracticable. Upon information and belief, and subject to discovery, the Classes consist of millions of members, the identity of whom are within the exclusive knowledge of Defendants and can be ascertained only by resorting to Defendants' records and discovery.

130. *Commonality*. There are numerous questions of law and fact common to the Classes relating to Defendants' conduct challenged herein, and those common questions predominate over any questions affecting only individual Class members. The common questions include, but are not limited to:

    a. Whether Defendants falsely and/or misleadingly represented that the YouTube Premium experience was "ad-free" and/or streaming content was without interruption;

    b. Whether Defendants' conduct was unlawful, unfair, deceptive, or negligent;

    c. Whether Defendants unjustly enriched themselves to the detriment of Plaintiffs and members of the Class;

    d. The proper measure of damages; and

    e. The declaratory and injunctive relief to which the Class is entitled.

131. *Typicality.* Plaintiffs' claims are typical of the claims of the other Class members in that they arise out of the same wrongful business practices engaged in by Defendants, as described herein.

132. *Adequacy of Representation.* Plaintiffs are adequate representatives of the Classes because Plaintiffs subscribed to YouTube Premium under the reasonable belief that it was "ad-free," yet received a streaming service with advertisements. Thus, Plaintiffs and Class members have sustained damage as a result of Defendants' uniform conduct. In addition:

a. Plaintiffs are committed to the vigorous prosecution of this action individually and on behalf of and all others similarly situated and have retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers against technology companies;

b. There is no hostility of interest between Plaintiffs and the unnamed Class members;

c. Plaintiffs anticipate no difficulty in the management of this litigation as a class action; and

d. Plaintiffs' legal counsel has the financial and legal resources to meet the substantial costs and legal work associated with this type of litigation.

133. *Predominance.* The questions of law and fact common to the Classes as set forth in the "commonality" allegation above predominate over any individual issues. As such, the "commonality" allegations are restated and incorporated herein by reference.

134. *Superiority.* A class action is superior to other available methods and highly desirable for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation and since the financial resources of Defendants are significant, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and Defendants' misconduct will proceed without remedy. In addition, even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and

28

expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

135.    In the alternative, Plaintiffs seek certification under Rule 23(c)(4) with respect to one or more of the above issues or such other issues as may be identified in the future.

COMPLAINT FOR DAMAGES

## FIRST CAUSE OF ACTION

## VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW ("FAL")

### (Cal. Bus. & Prof. Code § 17500, *et seq.*)

136.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

137.    This Claim is brought on behalf of the Nationwide Class and the California Class, referred to in this section collectively as the "Class."

138.    As alleged herein, Defendants represented that YouTube Premium streaming service was "ad-free" and that streaming content would be provided without interruption.

139.    In reality, Plaintiffs and the Class were provided streaming content that included advertisements and interruptions.

140.    Defendants knew or reasonably should have known that their violations are misleading to reasonable consumers.

141.    Defendants' violations were intended to, and did, induce reliance by Plaintiffs and Class members, and were a substantial factor in their decision to subscribe to YouTube Premium. Had Plaintiffs and Class Members known the true characteristics of Defendants' streaming service, which contained ads, Plaintiffs and Class members would not have purchased or subscribed to those services. A reasonable consumer would consider Defendants' violations important in deciding to subscribe to YouTube's Premium services.

142.    Defendants' violations were a substantial factor and proximate cause of economic harm to Plaintiffs and Class members.

143.    Plaintiffs and the Class request that the Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the Class any money Defendants acquired by unlawful practices, including restitution and/or restitutionary disgorgement, and for such other relief as set forth herein.

## SECOND CAUSE OF ACTION

## VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL")

### (Cal. Bus. & Prof. Code §§ 17200, *et seq.*)

30

COMPLAINT FOR DAMAGES

144. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

145. This Claim is brought on behalf of the Nationwide Class and the California Class, referred to in this section collectively as the "Class."

146. Plaintiffs and Defendants are "persons" within the meaning of the UCL. Cal. Bus. & Prof. Code § 17200.

147. The UCL prohibits any "unlawful, unfair or fraudulent business act or practice," each of which is separately actionable.

148. Defendants' knowing and intentional conduct, as described herein, constitutes unlawful, fraudulent, and unfair business acts and practices in violation of the UCL. Defendants have violated the UCL in at least the following ways:

    a. By misrepresenting that YouTube Premium streaming services are "ad-free" and that content will be provided without interruption by advertisements;

    b. By causing consumers to be billed or charged for goods or services that they did not request or bargain for;

    c. By causing consumers to be billed or charged for goods or services that they did not receive;

    d. By violating the other laws alleged herein, including the False Advertising Law.

149. Plaintiffs reserve the right to allege other violations of law, which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date. Unless restrained and enjoined, Defendants will continue to engage in the unlawful conduct described herein.

150. Defendants' representations or omissions were misleading to Plaintiffs and Class members, who reasonably relied upon them.

151. The harm to Plaintiffs and the Class greatly outweighs any public utility of Defendants' conduct. This injury was not outweighed by any countervailing benefits to consumers and competition and could not have been reasonably avoided by Plaintiffs and the Class. Defendants

violated established public policy and engaged in immoral, unethical, oppressive, unscrupulous, and substantially injurious conduct.

152. Defendants' violations caused Plaintiffs and Class members to suffer ascertainable losses and actual damages as a direct and proximate result of Defendants' actions and omissions.

153. Defendants' violations present a continuing risk to Plaintiffs and the Class, as well as to the general public. Defendants' unlawful acts and practices alleged herein affect the public interest.

154. Plaintiffs request that the Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing to engage in unfair, unlawful, and/or deceptive practices and to restore to members of the Class any money they acquired by law violations, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203; for attorneys' fees and costs under Cal. Code Civ. Prac. § 1021.5; and for such other relief as set forth herein.

155. Plaintiffs plead this claim separately as well as in the alternative to their claims for damages and other relief under Federal Rule of Civil Procedure 8(a)(3). To the extent Plaintiffs seek equitable relief, Plaintiffs lack an adequate remedy at law, and equitable and injunctive relief is necessary because Defendants' violative conduct is ongoing and is continuing to cause harm to the public.

**THIRD CAUSE OF ACTION**

**VIOLATION OF THE CONSUMERS LEGAL REMEDIES ACT ("CLRA")**

**(Cal. Civ. Code §§ 1750, *et seq.*)**

156. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

157. This Claim is brought on behalf of the Nationwide Class and the California Class, referred to in this section collectively as the "Class."

158. Plaintiffs and members of the Class are "consumers," as that term is defined by Civil Code § 1761(d).

159. Plaintiffs and Class members have engaged in "transactions" with Defendants, as that term is defined by Civil Code § 1761(e).

32

COMPLAINT FOR DAMAGES

160.    Plaintiffs and the Class purchased "goods" and/or "services" from Defendants as defined in Cal. Civ. Code § 1761(a), (b).

161.    The conduct alleged herein was undertaken by Defendants in transactions intended to result in, and which did result in, the sale of goods and/or services to consumers.

162.    The conduct alleged herein constitutes unfair methods of competition and unfair or deceptive acts or practices for purposes of the CLRA.

163.    By engaging in the conduct described herein, Defendants, individually and collectively, have violated California Civil Code § 1770 in at least the following ways:

    a.  By "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have;"

    b.  By "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and

    c.  By "[a]dvertising goods or services with intent not to sell them as advertised."

164.    Defendants, individually and collectively, violated the CLRA by representing to Plaintiffs that YouTube Premium streaming services are "ad-free" and that streaming content is available without interruption. But these representations are false, as members such as Plaintiffs and the Class are subjected to advertisements and interruptions.

165.    Defendants' representations were likely to deceive, and did deceive, Plaintiffs and reasonable consumers. Defendants knew or should have known that their representations are misleading to reasonable consumers.

166.    Defendants' representations were intended to induce reliance, and Plaintiffs and the Class reasonably relied upon them. Defendants' representations were a substantial factor in Plaintiffs' and the Class's purchase decisions.

167.    Defendants' violations of the CLRA proximately caused injury in fact to Plaintiffs and the Class.

168.    Defendants continue to violate the CLRA and continue to injure the public by misleading consumers about their goods and services.

COMPLAINT FOR DAMAGES

169.    Pursuant to Cal. Civ. Code § 1782(d), Plaintiffs, individually and on behalf of the Class and general public, seek a Court order enjoining the above-described wrongful acts and practices of Defendants.

## FOURTH CAUSE OF ACTION

## UNJUST ENRICHMENT

170.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

171.    This Claim is brought on behalf of the Nationwide and California Class.

172.    Plaintiffs and Class members conferred a monetary benefit on Defendants when they paid monthly subscription fees to obtain YouTube Premium's "ad-free" streaming services, but YouTube Premium did not provide "ad-free" streaming services as represented.

173.    Defendants appreciated or had knowledge of the benefits conferred upon them by Plaintiffs and Class members.

174.    As a result of Defendants' conduct, Plaintiffs and Class members suffered actual damages in an amount equal to the monies paid to obtain YouTube Premium streaming services.

175.    Under principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiffs and Class members because Defendants have obtained that money through misrepresentations and omissions.

176.    Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds received through the false and/or misleading advertising scheme described herein.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the members of the Class, respectfully request that the Court:

    a.    Certify this case as a class action, designating Plaintiffs as class representatives and designating the undersigned as Class Counsel;

    b.    Declaring that Defendants' conduct violates the statutes set forth above;

34

COMPLAINT FOR DAMAGES

c.  Award Plaintiffs and the Class actual damages in an amount according to proof;

d.  Award Plaintiffs and the Class restitution in an amount to be proven at trial;

e.  Award Plaintiffs and the Class punitive damages in an amount to be proven at trial;

f.  Award Plaintiffs and the Class pre-judgment interest in the amount permitted by law;

g.  Award Plaintiffs and their attorneys fees and costs as permitted by law;

h.  Declare Defendants' practices outlined herein to be unlawful;

i.  Enjoin Defendant from engaging in the practices outlined herein;

j.  Grant Plaintiffs and the Classes a trial by jury;

k.  Grant leave to amend these pleadings to conform to evidence produced at trial; and

l.  Grant such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs, by counsel, demand trial by jury.

Dated: July 14, 2026                         Respectfully submitted,

                                             */s/ Devin Bolton*
                                             Devin Bolton (SBN 290037)
                                             James Bilsborrow*
                                             Michael Piggins*
                                             Ashley Arraras*
                                             **WEITZ & LUXENBERG, PC**
                                             1880 Century Park East, Suite 700
                                             Los Angeles, California 90067
                                             Telephone: (310) 247-0921
                                             dbolton@weitzlux.com
                                             jbilsborrow@weitzlux.com
                                             mpiggins@weitzlux.com
                                             aarraras@weitzlux.com

                                             Matthew W. Broughton*
                                             Andrew M. Bowman*
                                             Jared A. Tuck*
                                             **GENTRY LOCKE ATTORNEYS**
                                             10 Franklin Rd. SE, Suite 900
                                             Roanoke, Virginia 24011

35
COMPLAINT FOR DAMAGES

Phone: (540) 983-9300
Fax: (540) 983-9400
broughton@gentrylocke.com
bowman@gentrylocke.com
jtuck@gentrylocke.com

* *Pro Hac Vice* applications to be submitted

*Counsel for Plaintiffs and the Proposed Classes*

36