James Bilsborrow (admitted *pro hac vice*)
*jbilsborrow@weitzlux.com*
**WEITZ & LUXENBERG, PC**
700 Broadway
New York, New York 10003
Phone: (212) 558-5500

[Additional Attorneys for Plaintiff Listed on Back Cover]

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| WILLIAM FLEMMING, DEVIN ROSE, KYLE NAVARRO, KATHY WALLACE, and JUSTIN DiPENTIMA, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>GOOGLE LLC and YOUTUBE, LLC,<br><br>Defendants. | **Civil Action No.: 3:26-cv-07182-AGT**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs William Flemming, Devin Rose, Kyle Navarro, Kathy Wallace, and Justin DiPentima, individually and on behalf of all others similarly situated, bring this Amended Class Action Complaint against Defendants Google LLC ("Google"), and YouTube, LLC ("YouTube"), and make the following allegations based upon information and belief, except as to allegations specifically pertaining to Plaintiffs, which are based on personal knowledge.

## NATURE OF THE ACTION

1. YouTube is one of the most popular free streaming video platforms in the world, offering billions of videos on nearly every subject matter imaginable.

2. Because the platform is free, however, viewers are bombarded with advertisements displayed while streaming video content. Some videos are interrupted every few minutes with advertisements lasting 30 seconds or longer that cannot be skipped. And even when the ads are skippable, they require manual action to get back to the content.

3. To avoid this annoyance and barrage of constant interruption, YouTube offers a paid streaming subscription called YouTube Premium, which promises members an escape from the constant, never-ending ads and interruptions.

4. YouTube Premium is a paid monthly subscription service with a simple value proposition: for a fee, members are offered a streaming experience that is "ad-free" with "no interruptions" during streamed content.

5. But this promise is hollow. YouTube Premium does not offer an "ad-free" and "uninterrupted" experience. To the contrary, advertisements and interruptions frequently appear during streamed content, interrupting videos with commercials for everything from popular automobiles to marketing for local attorneys or dietary supplements.

6. Below is an example of one such advertisement and interruption. The video podcast is interrupted by a one-minute segment, titled "Ads," which contains a commercial for a company and product unrelated to the video.



7. Plaintiffs are YouTube Premium members who relied on YouTube's representations that Premium was "ad-free" and that it would provide video content with no interruptions. Through this suit, Plaintiffs seek to put a stop to YouTube's misrepresentations and/or omissions, and to remedy their injuries.

**PARTIES**

8. Plaintiff William Flemming is a citizen of the State of California and resides in San Bernardino County, where he intends to remain.

9. Plaintiff Devin Rose is a citizen of the State of California and resides in Ventura County, where he intends to remain.

10. Plaintiff Kyle Navarro is a citizen of the State of California and resides in San Francisco, where he intends to remain.

11. Plaintiff Kathy Wallace is a citizen of the State of California and resides in Chula Vista, where she intends to remain.

12. Plaintiff Justin DiPentima is a citizen of the State of Florida and resides in Sebastian, where he intends to remain.

13. Defendant Google LLC is a Delaware limited liability company with its principal place of business located in Mountain View, California. Google regularly conducts and transacts business in this District and throughout the United States.

14. Defendant YouTube, LLC is a Delaware limited liability company with its principal place of business in San Bruno, California. YouTube is a wholly-owned subsidiary of Google. YouTube is widely available to consumers throughout the United States.

15. YouTube provides the YouTube Premium service through Google.

**JURISDICTION AND VENUE**

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action in which the matter in controversy exceeds $5,000,000 exclusive of interest and costs, and members of the putative Class are citizens of a state that is different from the state in which Defendants are citizens. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

17. This Court has personal jurisdiction over Defendants because their principal place of business is in California, and/or because they have contacts with California that are so continuous and systematic that they are essentially at home in this state. Defendants regularly conduct and solicit business in California, provide products and/or services by or to persons in the State of California, and derive substantial revenue from the same.

18. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' and the Class members' claims occurred in this District, and Defendants are subject to the Court's personal jurisdiction.

19. Venue is proper pursuant to the YouTube Terms of Service (the "Standard Terms"), which state in relevant part:

> All claims arising out of or relating to these terms or the Service will be governed by California law, except California's conflict of laws rules, and will be litigated exclusively in the federal or state courts of Santa Clara County, California, USA. You and YouTube consent to personal jurisdiction in those courts.

## BACKGROUND FACTS

### *A) YouTube's History and Business Model*

20. In December 2005, a group of design experts and computer scientists created YouTube and launched the product for public use. It originated as a platform that allowed viewers to stream content on virtually every topic imaginable—all for free.

21. Google recognized YouTube's huge profit potential and in 2006, just one year after its launch, Google acquired YouTube for more than $1.65 billion in Google stock.

22. Today, YouTube continues to be the number one streaming service in the United States and hosts over 8 billion streaming videos.

23. According to YouTube, over 20 million videos are uploaded to the platform per day. Approximately 500 hours of video are uploaded on the platform every minute.

24. All told, YouTube is the second most visited website in the world.

25. YouTube's dominant market share reflects the unique service it provides. It enables viewers to access a vast array of content—everything from television shows and creator content, to live-streaming, songs, podcasts, and movies.

26. Given its breadth, YouTube allows viewers to search for specific video and/or audio content. It also employs a powerful algorithm that exploits detailed user information to target each individual user with hours upon hours of videos (and ads) recommended by YouTube.

27. There are also over 113 million YouTube "channels," each of which is a homepage for a personal account. Individuals, content creators, and businesses create channels to upload videos and/or curated playlists.

28. For example, the popular entertainer Mr. Beast is the most subscribed-to YouTube channel, with over 490 million subscribers. Podcaster Joe Rogan's channel has over 21 million subscribers. Pop star Taylor Swift's YouTube channel has over 63 million subscribers. Each of these channels hosts the creator's original content, as well as content curated by the channel.

29. There is no other platform or service that houses a similar panoply of content. In the television and movie space, YouTube's competitors include Netflix, Amazon Prime Video, Disney+ and Hulu. In the short-form video space, YouTube's competitors include TikTok, Instagram, Vimeo, and Dailymotion. In the live-streaming space, YouTube's competitors include Twitch, Facebook Live, and TikTok LIVE. In the music space, YouTube's competitors include Spotify and Apple Music. While each of these services may compete with a portion of YouTube's content library, each lacks one or more core segments of YouTube's business. No single service provides the same breadth of content as YouTube.

***B) YouTube's Advertisements***

30. In 2005 and most of 2006, YouTube was entirely free of advertisements.

31. YouTube and Google, however, quickly realized that they could monetize YouTube's growing viewer base through various forms of advertisements that appear on its platform.

32. In 2007, YouTube first introduced banner ads that popped up on the bottom 20% of the screen and disappeared after 10 seconds.

33. In late 2008, YouTube introduced pre-roll ads—ads that played before videos began.

34. By 2008 and 2009, YouTube was primarily generating revenue by selling advertisements, and this has continued to date.

35. Around the same time, YouTube began to use algorithms to maximize how long viewers spent watching YouTube videos. The longer a viewer spends on the platform, the more ads the viewer sees. And the more ads the viewer sees, the more money YouTube makes.

36. But YouTube did not stop with disappearing banner ads and pre-roll ads. In 2012, it introduced mid-roll ads—ads that interrupt the flow of the content and play in the midst of the video being streamed.

37. By 2012, YouTube viewers were watching close to four billion hours of video every month. However, each viewer was only spending an average of fifteen minutes per day on the platform. Viewers navigated to YouTube with specific video content in mind, and after watching that content, they typically left the platform.

38. In order to further increase revenue, company management set a goal to increase daily watch time to one billion hours. Again, more watch time equals more ads shown, and more ads shown equals more money for YouTube.

39. Google executives decided that the best way to keep viewers on the site was to recommend videos that would autoplay directly after the prior video finished. The autoplay design change was a resounding success, significantly increasing the platform's daily watch time per viewer.

40. YouTube engineers also adjusted the algorithm to make it more successful over time. By 2018, YouTube Chief Product Officer Neal Mohan claimed that the YouTube algorithm's recommendations were responsible for more than 70% of the time viewers spent on the platform.

41. In 2021, YouTube made post-roll ads—ads that appear at the end of videos—the default for certain videos longer than 10 minutes.

42. In 2025, YouTube generated approximately $40.4 billion in ad revenue. That's more ad revenue than YouTube's next four largest competitors—Disney, NBC, Paramount, and Warner Bros. Discovery—combined.

43. Viewers regularly report that they dislike YouTube's ads, both because they interrupt content and appear at a seemingly constant clip.

44. Many viewers have attempted to install ad blockers to alleviate these interruptions. But YouTube has implemented mechanisms to detect and forbid ad-blocking software. If a viewer has an ad-blocker enabled, YouTube will not allow its videos to be played until the ad-blocker has been disabled. This forces viewers to endure advertisements if they wish to see YouTube content for free.

45. The ad experience on YouTube has led many viewers to look for ad-free options, or options with fewer advertisements.

***C) The predecessors to YouTube Premium***

46. YouTube has attempted to satisfy this ad-free demand. In 2014, the platform launched its first paid subscription service called Music Key, offering ad-free music streaming.

47. On October 28, 2015, YouTube launched the YouTube Red service, which expanded the ad-free promise of Music Key to its library of video content. This new subscription service sought to capitalize on the complaints YouTube received about its free streaming platform. As described by YouTube: "For years, YouTube's fans have been telling us they want more—more choice when watching their favorite content, more ways to support their favorite creators and, ***above all, the option to watch their favorite videos uninterrupted***."[1]

48. YouTube Red was founded on a simple, broad promise: "YouTube Red lets you enjoy videos across all of YouTube ***without ads.***"[2]

---

[1] Matt Leske, "Meet YouTube Red, the ultimate YouTube experience," YouTube Official Blog, https://blog.youtube/news-and-events/red/ (Oct. 21, 2015) (emphasis added).

[2] *Id.* (emphasis added)

49. Purportedly ad- and interruption-free video streaming was not the only benefit of YouTube Red. It also offered several other benefits to consumers, including watching videos offline and the playing videos in the background.

50. YouTube monetized these benefits for a monthly fee of $9.99.

***D) YouTube introduces YouTube Premium***

51. On May 17, 2018, YouTube announced that it was rebranding YouTube Red as "YouTube Premium."[3]

52. Like its predecessor, YouTube Premium was founded on the same simple, broad promise: "YouTube Premium will continue to provide an ***ad-free experience***."[4]

53. The other benefits of YouTube Red also continued with YouTube Premium. In addition to "ad-free" videos, YouTube Premium offered background play, downloads, and other features.[5]

54. This rebrand was accompanied by a marketing campaign extolling the purportedly ad-free nature of YouTube Premium. Indeed, shortly after launching the service, in June 2018, YouTube marketed YouTube Premium as: "YouTube and YouTube Music ***ad-free***."

---

[3] The YouTube Team, "Introducing YouTube Premium, YouTube Official Blog, https://blog.youtube/news-and-events/introducing-youtube-premium/ (May 17, 2018).

[4] *Id.* (emphasis added).

[5] *Id.*




55. YouTube Premium's core promise of ad-free video streaming was unambiguous and unqualified.

56. At the time YouTube Premium launched, the link to the fine-print "Restrictions" (*see supra* ¶ 54) in its marketing did not qualify its ad-free promise. As shown below, these "Restrictions" never even mention the topic of advertising.

**Offer restrictions**

Restrictions apply to certain features and vary by device, geographical location of the user, and others. Learn more

Only first-time YouTube Red, Music Premium, YouTube Premium and Google Play Music subscribers are eligible for free trials, introductory offers or promotional pricing.

Monthly subscription - 3 month trial. You'll be automatically charged the price listed unless you cancel during your trial, and then every month starting on the first billing date until you cancel your subscription. Cancel anytime. No refunds or credits for partial billing periods. Refund policy

Family subscription: Invite up to 5 additional family members to join your Google family group and share your Music Premium and YouTube Premium subscription. All family members must be age 13 or older, have a Google Account, and reside in the same household as the family manager. Learn more

Playback: You must have an Internet connection to stream videos or to take them offline. Supported devices

By completing your purchase, you verify that you are at least 18 years old and agree to these terms.

Done

57. Even the hyperlinked "terms" within the "Restrictions" (discussed above), did not attempt to limit or qualify YouTube Premiums' ad-free promise. At the time YouTube Premium launched, YouTube Premium's terms of service were entirely silent on the topic of ads.[6]

58. YouTube used the rebrand as an opportunity to increase the price of YouTube Premium to $11.99 per month for new members.

***E) The growth of YouTube Premium***

59. In the years that followed, YouTube Premium exploded. By February 2024, YouTube Premium had 100 million members—annualized growth of approximately 11 million members per year. Recently, on its Q3 earnings call in October 2026, the CEO for Alphabet, Inc. (Google and YouTube's parent company) announced that YouTube Premium eclipsed 150 million members—annualized growth of 25 million members per year.

60. Concomitant with rising subscriptions, the cost of YouTube Premium increased. In 2023, the price increased to $13.99 per month. In 2026, the price increased to $15.99 per month.

61. Additionally, YouTube charges higher prices for certain Premium subscription services, including those purchased on Apple devices. In particular, YouTube charges $20.99 for individual Premium plans purchased through the YouTube iOS app and charges $34.99 for "Family Membership" Premium subscriptions purchased via the iOS app.

62. Outside of the iOS app, YouTube offers a "Family Membership" Premium subscription for $26.99 per month and a "student" Premium subscription for $8.99 per month.

63. During these years of rapid growth, YouTube continued to find ways to capitalize on its dominant market share. In 2021, YouTube launched YouTube Premium Lite as a pilot test in certain European markets. The concept was to provide a streaming experience with fewer ads than the standard free service at a price that was discounted from the Premium price. In March 2025, YouTube rolled out Premium Lite in the United States, charging $7.99 per month for what it described as a "more affordable way to enjoy most videos on YouTube ad-free." In other words,

---

[6] *See* YouTube's "Terms of service for paid services on YouTube" (effective August 17, 2016).

Premium Lite promised a lower monthly fee than its Premium counterpart, but Lite members would still be subjected to some advertising.

64. YouTube Premium's core promise nevertheless remained the same, as it has since its inception.

65. For example, in or about November 30, 2019, the YouTube Premium sign-up page prominently marketed it as being "YouTube and YouTube Music ad-free," as shown below.




66. Since at least April 1, 2020, in addition to being "ad-free," YouTube marketed YouTube Premium as being "uninterrupted."

67. Similarly, in or about April 1, 2021, YouTube continue to tout YouTube Premium as "YouTube and YouTube Music ad-free, offline, and in the background," and enabling members to "[w]atch videos uninterrupted by ads."

68. Occasionally, YouTube would tweak its marketing campaign to run special promotions. Even then, YouTube's marketing for YouTube Premium focused on its core promise of being "ad-free" and "uninterrupted." For example, in or about November 30, 2021, YouTube ran a promotion: "Cyber Week special: Get 3 free months of ad-free videos and music. Offer ends December 6." This promotion was accompanied by the promise to "[w]atch videos uninterrupted by ads."

69. YouTube further represented that Premium lets members "[k]eep playing what you love—uninterrupted," by viewing "[u]nlimited ad-free videos." Thus, members could "[i]mmerse in more of [their] favorite videos without waiting for ads," and do it "all without any interruptions."




70. At bottom, YouTube ran—and continues to run—a longstanding marketing campaign in which it represented YouTube Premium as being "ad-free" and without interruptions. This marketing campaign was ubiquitous and, upon information and belief, was prominently displayed on the YouTube Premium sign-up page *every time* a consumer subscribed to YouTube Premium.

71. Thus, a reasonable consumer would understand YouTube Premium's promise of being "ad-free" and "uninterrupted" to be just that: a streaming experience that did not have advertisements or interruptions of any kind.

***D) YouTube Premium's Misrepresentations***

72. YouTube's longstanding marketing campaign has continued unabated to the present. Now, when a consumer attempts to sign up for YouTube Premium, a YouTube screen displays information stating that the service is "Ad-free" with "No interruptions" prominently featured in bold, large font.[7]




73. This message: "Ad-free" and without interruptions is reinforced again and again across YouTube's pages that describe and tout its Premium service.

---

[7] https://www.youtube.com/premium

74. These representations—"ad-free" and without interruptions—are unambiguous, unqualified, and appear on the very first pages that a prospective Premium member sees after clicking the YouTube Premium link to explore membership options.

75. On the sign-up webpage for Premium, YouTube draws a sharp line between Premium and Premium Lite. For Premium Lite, YouTube promises that "Most videos are ad-free," while for Premium, it promises "Ad-free" on "All videos."[8]

76. YouTube even provides consumers with an easy-to-use graphic comparing the benefits—including the ad-free benefits—of YouTube Premium and YouTube Premium Lite.

**Compare memberships**

| | YouTube | New<br>Premium Lite<br>$8.99/mo<br>Cancel anytime<br>Buy now | Premium<br>$15.99/mo<br>Cancel anytime<br>Buy now |
|---|---|---|---|
| Millions of videos across devices | ✓ | ✓ | ✓ |
| Ad-free YouTube videos | — | ✓ Most videos* | ✓ All videos |
| Ad-free YouTube Kids | — | ✓ Most videos* | ✓ All videos |
| Background play | — | ✓ Most videos* | ✓ All videos |
| Download and play offline | — | ✓ Most videos* | ✓ All videos |
| Ad-free YouTube Music app | — | — | ✓ |
| Continue watching, queuing, Jump ahead, high quality audio & video, and more | — | — | ✓ |

[8] https://www.youtube.com/premium

77. The FAQ on the Premium sign-up page reinforces the promise: "Premium is all of YouTube and YouTube Music ad-free, offline, and in the background. Enjoy every Premium feature across all content types." YouTube further promises that "YouTube Premium offers an ad-free experience across all of YouTube."

78. A reasonable consumer would understand YouTube's representations to mean that in exchange for monthly subscription payments, YouTube Premium will contain no ads and no interruptions. In comparison, a reasonable consumer would understand that in exchange for a lesser monthly subscription payment, YouTube Premium Lite would display limited ads in some streaming content. Consumers can therefore choose a product based on their price and advertising sensitivities. Or so they are led to believe.

***E) YouTube Premium Has Ads***

79. Contrary to YouTube's representations, videos streamed on YouTube Premium are littered with ads. These ads often have nothing to do with the streaming content at all.

80. This includes ads for everything from insurance companies to dietary supplements to new models of vehicles for purchase. Ads appear both before and during video content, interrupting content flow just as they do on YouTube Premium Lite and standard YouTube.

81. For example, a popular content creator and podcaster, Theo Von, included an advertisement for Pepsi in the midst of his podcast interview with Kevin James, a prominent actor and comedian. Theo Von spends the first 23 minutes of the video interviewing Kevin James. The content is not about Pepsi, Super Bowl commercials, or polar bears. But at 23 minutes and 24 seconds elapsed, the video cuts away from the interview with Kevin James to an advertisement for Pepsi. This advertisement replays Pepsi's Super Bowl commercial, where a polar bear performs a blind taste test comparing Pepsi and Coca-Cola.




82. In the above screenshot, the red YouTube play button with the word "Premium" next to it in the top left corner indicates that video is being viewed within YouTube Premium's paid service.

83. In this example, it is not until approximately three minutes later, at 26 minutes and 18 seconds elapsed, that Theo Von's interview with Kevin James resumes. The Pepsi advertisement and commercial are completely unrelated to the interview with Kevin James.

84. Another example of an ad within YouTube Premium appears in a video posted by Kallmekris, a popular YouTube channel where the creator discusses true crime stories. For the first 46 minutes of the video, the content creator discusses the true crime story, but at 46 minutes 14 seconds elapsed, the content transitions away from the true crime story and shifts to a video advertisement for a company called Surfshark, which offers a VPN service and a web content blocker.




85. In this example, it is not until over one minute later, at 47 minutes and 25 seconds elapsed, that the true crime story resumes. The true crime story is about a serial killer and is completely unrelated to Surfshark, VPN services, or web content blockers.

86. Some ads within YouTube Premium appear within just the first several seconds of the video.

87. For example, a popular gaming channel called Markiplier, posted a video where the content creator plays Endoparasitic 2, a survival game. Just 10 seconds into the 50-minute video, the video contains an advertisement for a company called NordVPN, which offers a VPN service. After an approximately one-minute video advertisement for NordVPN, the video transitions back to the Endoparasitic 2 gameplay, which has nothing to do with NordVPN or VPN services.




88. One of YouTube's popular content creators, The Diary Of A CEO, acknowledges that such advertisements are not part of the expected content, so he labels these segments "Ads."




89. In this example, the video shifts away from an interview with Neil deGrasse Tyson and transitions to a video advertisement for an ekster travel pack, which is completely unrelated to the interview.

90. There are countless other examples of video advertisements within YouTube Premium.

91. At all relevant times that YouTube marketed and sold the YouTube Premium service, YouTube knew or should have known about the advertisements, including those discussed above, that are within YouTube Premium.

92. In summary, YouTube Premium members pay elevated monthly fees for a streaming service that is touted as "ad-free." The service they are receiving, however, is full of ads during streamed videos.

***G) YouTube Premium's Terms Do Not Attempt to Disclaim the Presence of Ads in YouTube Premium.***

93. YouTube has "Paid Service Terms of Service" (the "Premium Terms") for YouTube Premium.[9]

94. The Premium Terms make explicit what other documents are incorporated therein: (i) the Premium Terms; (ii) YouTube's general Terms of Service (*i.e.*, the Standard Terms); (iii) YouTube's Paid Service Usage Rules; and (iv) the YouTube Community Guidelines.

95. No other documents are incorporated by reference into the Premium Terms.

*i) <u>Prior to September 26, 2025, the Premium Terms contained no reference related to the "ad-free" and without interruptions promise.</u>*

96. For years, from YouTube Premium's inception through September 25, 2025, the Premium Terms did not mention the topic of advertisements.

97. Thus, during that time period, the Premium Terms did not even attempt to contain a restriction, limitation, qualification, or any other explanation related to YouTube's promise that YouTube Premium would be "ad-free" and without interruptions.

*ii) <u>On and after September 26, 2025, the Premium Terms still do not reference YouTube Premium's core promise of being "ad-free" and without interruptions.</u>*

98. Consumers who subscribed to YouTube Premium on or after September 26, 2025 were subject to a revised set of Premium Terms,[10] which include a new section titled "Additional Terms for YouTube Premium, YouTube Music Premium and YouTube Premium Lite (and accepted payment methods)" (the "Additional Terms").

---

[9] The Premium Terms are also applicable to other YouTube paid services.

[10] The revised Premium Terms were again updated effective February 11, 2026, with changes immaterial to this matter. *See* "YouTube Paid Service Terms of Service," https://www.youtube.com/t/terms_paidservice (effective February 11, 2026).

99. The revised Premium Terms contain only one reference to ads. Section 7 of the Additional Terms is titled "Features."[11] There, YouTube states: "For clarity, ads or promotions may appear during live events streamed on YouTube, such as sporting events."

100. A reasonable consumer viewing YouTube's representations in the revised Premium Terms would *still* believe that in exchange for the monthly fees charged, YouTube Premium offers an ad-free experience without interruptions (with the possible exception of live events).

101. However, hidden behind the word "Features" in Section 7 of the Additional Terms is a hyperlink. By clicking that hyperlink, the consumer is forced to leave the revised Premium Terms and is redirected to an entirely different website: YouTube Help.

102. The linked YouTube Help page is titled "Use your YouTube Premium benefits" (the "Help Article"), and contains subheadings for YouTube Premium's purported benefits, including "Watch videos without ads."[12]

103. Upon information and belief, effective September 26, 2025 the "Features" hyperlink to the Help Article was added to the Premium Terms because of consumer complaints about the continued presence of ads and interruptions in YouTube Premium.

104. Not only is the Help Article found on an entirely different website, it is not incorporated into the revised Premium Terms.

***F) YouTube's Help Article***

*i) <u>Overview.</u>*

105. The Help Article has existed for many years—beginning with YouTube Red, and then modified with the rebranding to YouTube Premium. It has never disclaimed the core promise that YouTube Premium was ad-free. To that point, under the heading "Ad-free videos," the Help Article originally stated:

---

[11] "YouTube Paid Service Terms of Service," https://www.youtube.com/t/terms_paidservice?archive=20250926-en (effective September 26, 2025).

[12] YouTube Help, "Use your YouTube Premium benefits," https://support.google.com/youtube/answer/6308116

> With YouTube Premium, you can watch millions of videos without ads. This includes ads before and during a video, as well as banner ads, search ads, and video overlay ads. You may still see branding or promotions embedded in creators' content that isn't controlled by YouTube.
>
> Ad-free videos are supported across all devices and platforms where you can sign in with your Google account—including on compatible smart TVs/gaming consoles and the YouTube, YouTube Music, YouTube Gaming, and YouTube Kids mobile apps, if they're available in your location.

106. The Help Article evolved slightly over time. By September 21, 2019, the Help Article changed the heading from "Ad-free videos" to "Watch ad-free videos," and then stated:

> With YouTube Premium, you can watch millions of videos without ads. This includes ads before and during a video, as well as banner ads, search ads, and video overlay ads.
>
> You may still see branding or promotions embedded in content, when such messaging is placed there by the creator. You may also see links in and around content that are added by the creator. These links could be for their website, merchandise, event tickets, a membership to their channel, or other related destinations they are promoting. . . .

107. The current Help Article contains similar language, and also has a three-minute video that discusses how to sign up for YouTube Premium, the different YouTube Premium plans, and the benefits of each plan.




108. In the video, YouTube again promises that YouTube Premium will be an “ad-free experience” with “uninterrupted viewing.” The video reinforces a reasonable consumer’s expectation from YouTube’s marketing, representations, and Premium Terms that YouTube Premium will not have any ads or interruptions.

109. If a consumer clicks on the “Watch videos without ads” heading, a drop down appears that reads as follows:

Watch videos without ads

With **YouTube Premium**, you can watch millions of videos without interruptions by ads before and during a video. You will also not see third-party banner ads and search ads.

You may still see branding or promotions embedded in the content by the creator, as well as promotional links, shelves and features in and around the content that are added or enabled by the creator. These links, shelves and features could be for their website, merchandise, membership to their channel, event tickets, or other related destinations that they are promoting. Ads or promotions may also appear on Primetime Channels, during live events streamed on YouTube, such as sporting events.

Ad-free videos are supported across all devices and platforms with access to YouTube—including on compatible smart TVs/gaming consoles and the YouTube, YouTube Music, and YouTube Kids mobile apps, if they're available in your location.

**YouTube Music Premium** offers a similar experience, allowing you to enjoy music content in the YouTube Music app without ads.

110. At the bottom of the current Help Article, there is a second video.

## Sign up to enjoy Premium benefits

To enjoy Premium benefits, sign up at youtube.com/premium/inapp .




Subscribe to the YouTube Viewers channel for the latest news, updates, and tips.

**Note:** YouTube TV, Primetime channels, channel memberships, and NFL Sunday Ticket are not included in YouTube Premium or Music Premium benefits.

Give feedback about this article

111. The second video in the Help Article reiterates YouTube Premium's core promise—that it is "ad free."

*ii) <u>The Help Center article states that members may see promotions, but not ads.</u>*

112. The Help Article uses terms—branding, promotions, promotional links, shelves, and features (collectively, "Promotions")—which have a specific meaning to consumers.

113. To be clear, the Help Article does not say that consumers will still see "ads" on YouTube Premium. Instead, YouTube attempts to draw a distinction between "ads" and Promotions. Accordingly, a reasonable consumer—assuming they ever found or read the Help Article—would understand that Promotions are something other than an "ad."

114. In other words, consumers would only expect to see Promotions while watching videos on YouTube Premium. Consumers would not expect to see ads.

115. For example, one popular content creator named Logan Paul has a podcast channel named "IMPAULSIVE." Logan Paul is also an owner of Prime, a sports drink brand, and Lunchly, a grab-and-go meal kit brand. In the IMPAULSIVE video podcasts, Logan Paul includes branding by staging his Prime drinks and Lunchly meal kits around the speakers in his videos.



116. In another example, popular Do-It-Yourself channel "HomeRenoVisionDIY" self-promotes a related series of videos, titled "Forever Home Renovation Series," and invites viewers to subscribe to the channel.




117. Other creators, such as Taylor Swift, include promotional links in the description box below their videos, including links to her own website, music, merchandise store, and social media accounts.

Premium

Search or ask a question



Taylor Swift - The Fate of Ophelia (Official Music Video)

Taylor Swift
63.3M subscribers

Subscribe

3.5M Share Ask Save

454,940,025 views Premiered Oct 5, 2025 #33 global top music video
The official music video for "The Fate of Ophelia"

Visit https://TaylorSwift.com to watch the official "Opalite" music video.

Stream/download 'The Life of a Showgirl': https://taylor.lnk.to/TSTheLifeofaSho...

►Subscribe to Taylor Swift on YouTube: https://ts.lnk.to/subscribe
►Shop Merch: http://taylor.lnk.to/store
►Follow Taylor Swift Online:
TikTok: / taylorswift
Instagram: / taylorswift
Twitter: / taylorswift13
Snapchat: / taylorswift
Facebook: / taylorswift
Tumblr: / taylorswift
Website: http://www.taylorswift.com

►Follow Taylor Nation Online
TikTok: / taylornation
Instagram: / taylornation
YouTube: / taylornation
Twitter: / taylornation13
Tumblr: / taylornation

118. Taylor Swift also utilizes YouTube's product shelf feature, which appears below videos, to promote her online store. One of her product shelves is entitled "Shop the Taylor Swift store." The shelf previews a few items that can be purchased from Taylor Swift's online store. Viewers can click on the products displayed on the shelf, which will take them to the page where the product can be purchased from Taylor Swift's online store.



*iii) <u>Interpreting Promotions to include "ads" violates YouTube Premium's core promise.</u>*

119. As demonstrated above (*see supra* ¶¶ 6, 79-92), YouTube Premium members are still shown ads while watching videos. This violates the very value proposition upon which YouTube Premium is based.

120. YouTube Premium members expect to receive what they are promised and what they pay for—an "ad-free" experience.

121. Consumers are deceived if YouTube prominently advertises and sells the Premium service as "ad-free," yet later attempted to renege on this promise by re-defining advertisements under a new name—Promotions. That would simply be word games and double talk.

122. Regardless of whether the ad is placed by YouTube or the content creator, the user experience is the same—they are still subjected to annoying ads after paying YouTube to enjoy video content "ad-free."

123. If YouTube Premium members were agreeable to paying for a service with some ads, then they would have subscribed to Premium Lite and paid a lower monthly fee, but they expressly purchased an "ad-free" service. YouTube Premium does not deliver such service, contrary to its express representations.

124. YouTube could prevent its Premium members from being forced to sit through ads placed by its content creators, yet YouTube has failed or refused to take steps to eliminate such ads from the viewing experience of its Premium members.

125. Alternatively, YouTube could market YouTube Premium truthfully, and disclose to consumers up-front that they will still see ads in YouTube Premium. It has refused to do so.

***H) YouTube Premium Has Interruptions***

126. No matter how YouTube characterizes it—whether an ad or a Promotion—the content is nevertheless interrupted. *See supra* ¶¶ 6, 79-92.

127. And even assuming *arguendo* that revised Premium Terms incorporate the Help Article, interruptions are not addressed at all by the Help Article.

128. In each of the examples mentioned above, the expected content pauses, transitions to new content attempting to sell a product or service, and then transitions back to the content of the video.

129. Often there are both visual and audio cues that demonstrate the interruption.

130. Sometimes the content will include a transition slide before and after the interrupting ad.

131. Sometimes the content will include a sound effect that signifies the interruption of the advertisement, such as the sound of flipping the page of a book.

132. In the above example from Kallmekris, the content creator creates a cliffhanger at a critical point in the plot and says “we will get to that soon” before transitioning to the advertisement for Surfshark. After the conclusion of the ad, the creator states “And let’s get back to it” before returning to the plot.

133. Some content includes a loading bar at the bottom of the interruption that moves from the left portion of the screen to the right portion of the screen, serving as a visual cue to show viewers when the regular and expected programming will resume.

134. Some content even labels these distinct and interrupting segments of their videos, recognizing that they are interruptions.

135. When YouTube marketed and sold the YouTube Premium service, YouTube knew or should have known that YouTube Premium contained interruptions—irrespective of whether such interruptions are coined an “ad” or a Promotion.

136. And, YouTube advertised and sold—and continues to advertise and sell—Premium as having “no interruptions.”

***I) Consumers Suffer Injury from Defendants’ Conduct.***

137. Consumers are induced into making the original decision to purchase YouTube Premium based on YouTube’s misrepresentations. Consumers rely on YouTube’s core promise that YouTube Premium would be “ad-free” and without interruptions. It is this promise that primarily sets YouTube Premium apart from YouTube’s free or less expensive services—evidenced by the fact that YouTube prominently makes the promise at the top of the YouTube Premium sign-up page.

138. Consumers are injured in multiple ways. Many consumers would not have subscribed to YouTube Premium at all if—at the time of the original decision—they knew YouTube Premium still contained ads and interruptions.

139. Additionally, consumers pay more and/or acquire less in the transaction than they otherwise would have—consumers believed they were buying a service without ads and interruptions, but YouTube Premium still has ads and interruptions.

140. It is not immediately apparent that YouTube Premium still contains ads and interruptions. Undoubtedly there is a period—which could last months or even years—between the consumers' original purchase decision and the point when the realization clicks: YouTube Premium's promise of "ad-free" and "uninterrupted" content was a lie.

141. Consumers suffer other injuries as well.

142. For example, ads and interruptions waste the consumers' time. Individually, each ad may seem short, but they can add up to significant amounts of lost time over the course of a day, week, and year. A consumer that wastes just four (4) minutes on ads per day loses more than twenty-four (24) hours over the course of a year—*an entire day* lost to unwanted advertising.

143. Time is finite and valuable. Every minute that consumers are subjected to ads is time not spent doing something else productive—work, leisure, or other activities that the consumer values. That is central to YouTube Premium's value proposition. Consumers are willing to pay a premium fee to save that time.

144. Ads and interruptions are also annoying. Each ad and interruption interferes with the viewing experience, breaks attention and focus on the desired content, and forces viewers to tolerate an unwanted disruption before returning to their desired content. Repeated ads and interruptions compound that annoyance. These ads and interruptions makes the content materially less enjoyable. That too central to YouTube Premium's value proposition. Consumers are willing to pay a premium fee to avoid that annoyance.

145. This annoyance is only magnified upon realizing that YouTube violated its core promise, and that YouTube Premium is not actually ad- and interruption-free. Each unwanted ad

and interruption reinforces the discrepancy between the service YouTube sold them and the ad- and interruption-filled service that was actually delivered.

146. After discovering YouTube's deception, some consumers, upset by the ads, may terminate their YouTube Premium subscription. Those consumers, however, would likely resubscribe to YouTube Premium if the service actually lived up to its ad- and interruption-free promise.

147. Other consumers may continue to subscribe to YouTube Premium, despite it being unsatisfactory. But they still receive less than they expected and were promised.

148. These consumers may continue to subscribe to YouTube Premium for many reasons. First and foremost, because they have no reasonable alternative, particularly given YouTube's dominant market share. There is no other single platform that provides the same breadth of content as YouTube. In order to obtain the same breadth of content as YouTube, consumers would have to sign up for multiple platforms or services, each with an attendant cost. Having content on a single platform has value to consumers. And consumers are willing to continue to subscribe to YouTube Premium, despite its misrepresentations, to avoid having to invest substantially more time and money to subscribe to, learn, and switch between several other sources depending on the desired content.

149. Additionally, while YouTube Premium is not "ad-free" and without interruptions, it still has less ads and interruptions than YouTube's other services, providing some value.

150. Further, YouTube Premium provides some other benefits that have value to consumers not present in YouTube's free service or less expensive Premium Lite service, including, but not limited to: (i) the ability to continue watching videos where the user last left off,; (ii) queuing content; (iii) YouTube Premium's "jump ahead" feature; (iv) higher quality audio and video; and (v) the ability to download and view offline all content.

***J) Plaintiffs' Experiences***

151. Plaintiff William Flemming has been a YouTube Premium member since 2019.

152. On average, Mr. Flemming watches or listens to approximately six hours of YouTube Premium per day.

153. Although he thought he was purchasing an experience in which video would not be interrupted by ads, Mr. Flemming is subjected to advertising constantly.

154. For example, Mr. Flemming has streamed videos that have been interrupted by ads from the dollarwise app, various gaming apps, and a service called Incogni.

155. Before subscribing to Premium, Mr. Flemming saw YouTube's representation that the service was ad-free and subscribed for exactly this reason.

156. Although he realized this promise was untrue at some point after subscribing, Mr. Flemming is unable to stream many of the videos he wishes to watch through other means, thus continuing with unsatisfactory service. In addition, while Premium includes ads and interruptions, these occur less frequently than with Premium Lite or regular YouTube, leaving Mr. Flemming unsatisfied with Premium but faced with no good alternatives.

157. Mr. Flemming paid for an "ad-free" experience with no interruptions and would like to watch videos on YouTube without experiencing ads that interrupt his video stream.

158. Plaintiff Devin Rose has been a YouTube Premium member since 2018.

159. Prior to subscribing to Premium, Mr. Rose saw YouTube's representation that Premium was delivered ad-free.

160. Mr. Rose subscribed to YouTube Premium so that he could obtain a YouTube experience without advertisements interrupting the video stream.

161. Mr. Rose did not receive what he bargained for; instead, he is commonly subjected to advertisements both before and during the videos that he streams while watching and/or listening to YouTube.

162. Mr. Rose has paid for an "ad-free" experience and would like to listen and watch videos on YouTube without experiencing ads that interrupt his video stream. He continues to subscribe because he is unable to stream the content he is looking for on other platforms.

163. Plaintiff Kyle Navarro has been a YouTube Premium member since August 2023.

164. Mr. Navarro subscribed to YouTube Premium because he wanted an ad-free experience while streaming content he was interested in.

165. Before subscribing to YouTube Premium, Mr. Navarro saw YouTube's representations, similar to those depicted herein, that Premium was completely "ad free" and streaming content had no interruptions.

166. YouTube's representations convinced Mr. Navarro to subscribe to Premium service.

167. Mr. Navarro uses YouTube Premium to stream podcasts, video essays, product reviews, and entertainment. In each of these channels, YouTube Premium streaming content contains forced in-video ads. In the recent past alone, Mr. Navarro has seen in-video ads for BetterHelp, Squarespace, Rocket Money, Groundnews, Skillshare, Audible, Temu, HelloFresh, and Zocdoc—all products or services that have nothing to do with the content Mr. Navarro is streaming.

168. These in-video, interrupting ads have devalued Mr. Navarro's experience and wasted his time among other things.

169. Mr. Navarro continues to subscribe to Premium despite his dissatisfaction with the ads and interruptions because Premium has fewer ads and interruptions than regular YouTube (and presumably, YouTube Premium Lite), Premium offers other benefits, and Mr. Navarro is unable to stream his desired content elsewhere.

170. Plaintiff Kathy Wallace has been a YouTube Premium member since December 2022.

171. Ms. Wallace subscribed to YouTube Premium to obtain an ad-free experience and view streaming content without interruptions.

172. Prior to subscribing to YouTube Premium, Ms. Wallace saw YouTube's representations that its Premium service was "ad-free" and provided streaming content without interruptions.

173. In Ms. Wallace's experience interacting with other consumers online, it was commonly understood that YouTube Premium was supposed to be ad-free.

174. Because she was seeking to escape online ads, Ms. Wallace subscribed to what she believed to be an ad-free streaming experience in YouTube Premium.

175. After subscribing, Ms. Wallace realized that she was still being served ads, often in much the same manner as programs viewed on television.

176. Ms. Wallace's experience, while recent, was not atypical. The fact that she regularly see ads that interrupt streaming content has upset Ms. Wallace, and she believes she is not the service that she believed she purchased in subscribing to YouTube Premium.

177. Plaintiff Justin DiPentima has been a YouTube Premium member since November 2022.

178. The primary reason Mr. DiPentima subscribed to YouTube Premium was to stream content free of advertising.

179. Prior to subscribing, Mr. DiPentima saw YouTube's representations that YouTube Premium was "ad-free" and that content would not be interrupted by ads. Again, this was the primary reason Mr. DiPentima subscribed.

180. After subscribing, Mr. DiPentima realized he was still being served ads that interrupted streaming content.

181. Although Mr. DiPentima wishes to use the streaming Premium service without ads, he has been unable to, and has been disappointed that Premium is not what was represented.

182. Indeed, Mr. DiPentima is caught between a rock and a hard place; Premium fails to deliver the service promised but has fewer ads than other streaming services. Thus, while Mr. DiPentima is unsatisfied, he is left with few good options.

183. Indeed, all Plaintiffs wish to have the service that was touted: content that was "ad-free" without interruptions.

## CLASS ALLEGATIONS

184. Plaintiffs bring this action individually and on behalf of all others similarly situated. The proposed classes are defined as:

**Nationwide Class:**

All adult persons in the United States who, during the applicable limitations period, subscribed to YouTube Premium for one or more months under the reasonable (but mistaken) belief that in exchange for monthly subscription fees, they would receive an "ad-free" and without interruptions experience.

**California Class:**

All adult persons residing in the State of California who, during the applicable limitations period, subscribed to YouTube Premium for one or more months under the reasonable (but mistaken) belief that in exchange for monthly subscription fees, they would receive an "ad-free" and without interruptions experience.

**Florida Class**:

All adult persons residing in the State of Florida who, during the applicable limitations period, subscribed to YouTube Premium for one or more months under the reasonable (but mistaken) belief that in exchange for monthly subscription fees, they would receive an "ad-free and without interruptions experience.

185. The Nationwide Class, California Class, and Florida Class are collectively referred to herein as the "Classes."

186. Excluded from the Classes are Defendants, their subsidiaries and affiliates, officers, directors, the members of their immediate families, and any entity in which any Defendant has a controlling interest, to include the legal representatives, heirs, successors, or assigns of any such excluded party. Also excluded are the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

187. Plaintiffs reserve the right to modify or amend the definition of the proposed Classes if necessary, before this Court determines whether certification is appropriate.

188. This case is properly brought as a class action under Fed. R. Civ. P. 23(b)(2) and (b)(3) and all requirements are met for the reasons set forth in the following paragraphs.

189. *Numerosity*. The members of the Classes are so numerous that separate joinder of each member is impracticable. Upon information and belief, and subject to discovery, the Classes consist of millions of members, the identity of whom are within the exclusive knowledge of Defendants and can be ascertained only by resorting to Defendants' records and discovery.

190. *Commonality*. There are numerous questions of law and fact common to the Classes relating to Defendants' conduct challenged herein, and those common questions predominate over any questions affecting only individual Class members. The common questions include, but are not limited to:

a. Whether Defendants falsely and/or misleadingly represented that the YouTube Premium experience was "ad-free" and/or streaming content was without interruption;

b. Whether Defendants' conduct was unlawful, unfair, deceptive, or negligent;

c. Whether Defendants unjustly enriched themselves to the detriment of Plaintiffs and members of the Class;

d. The proper measure of damages; and

e. The declaratory and injunctive relief to which the Class is entitled.

191. *Typicality.* Plaintiffs' claims are typical of the claims of the other Class members in that they arise out of the same wrongful business practices engaged in by Defendants, as described herein.

192. *Adequacy of Representation.* Plaintiffs are adequate representatives of the Classes because Plaintiffs subscribed to YouTube Premium under the reasonable belief that it was "ad-free," yet received a streaming service with advertisements. Thus, Plaintiffs and Class members have been harmed as a result of Defendants' uniform conduct. In addition:

a. Plaintiffs are committed to the vigorous prosecution of this action individually and on behalf of all others similarly situated and have retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers against technology companies;

b. There is no hostility of interest between Plaintiffs and the unnamed Class members;

c. Plaintiffs anticipate no difficulty in the management of this litigation as a class action; and

d. Plaintiffs' legal counsel has the financial and legal resources to meet the substantial costs and legal work associated with this type of litigation.

193. *Predominance.* The questions of law and fact common to the Classes as set forth in the "commonality" allegations above predominate over any individual issues. As such, the "commonality" allegations are restated and incorporated herein by reference.

194. *Superiority.* A class action is superior to other available methods and highly desirable for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation and since the financial resources of Defendants are significant, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and Defendants' misconduct will proceed without remedy. In addition, even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

195. In the alternative, Plaintiffs seek certification under Rule 23(c)(4) with respect to one or more of the above issues or such other issues as may be identified in the future.

**FIRST CAUSE OF ACTION**

**VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW ("FAL")**

**(Cal. Bus. & Prof. Code § 17500, *et seq.*)**

196. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

197. This Claim is brought on behalf of the Classes.

198. As alleged herein, Defendants represented that YouTube Premium streaming service was "ad-free" and that streaming content would be provided without interruption.

199. In reality, Plaintiffs and the Class were provided streaming content that included advertisements and interruptions.

200. Defendants knew or reasonably should have known that their violations are misleading to reasonable consumers.

201. Defendants' violations were intended to, and did, induce reliance by Plaintiffs and Class members, and were a substantial factor in their decision to subscribe to YouTube Premium. Had Plaintiffs and Class Members known the true characteristics of Defendants' streaming service, which contained ads, Plaintiffs and Class members would not have purchased or subscribed to those services. A reasonable consumer would consider Defendants' violations important in deciding to subscribe to YouTube's Premium services.

202. Defendants' violations were a substantial factor and proximate cause of economic harm to Plaintiffs and Class members.

203. Plaintiffs and the Class request that the Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the Class any money Defendants acquired by unlawful practices, including restitution and/or restitutionary disgorgement, and for such other relief as set forth herein.

**SECOND CAUSE OF ACTION**

**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL")**

**(Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

204. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

205. This Claim is brought on behalf of the Classes.

206. Plaintiffs and Defendants are "persons" within the meaning of the UCL. Cal. Bus. & Prof. Code § 17200.

207. The UCL prohibits any "unlawful, unfair or fraudulent business act or practice," each of which is separately actionable.

208. Defendants' knowing and intentional conduct, as described herein, constitutes unlawful, fraudulent, and unfair business acts and practices in violation of the UCL. Defendants have violated the UCL in at least the following ways:

a. By misrepresenting that YouTube Premium streaming services are "ad-free" and that content will be provided without interruptions;

b. By causing consumers to be billed or charged for goods or services that they did not request or bargain for;

c. By causing consumers to be billed or charged for goods or services that they did not receive;

d. By violating the other laws alleged herein, including the False Advertising Law and/or the Consumers Legal Remedies Act.

209. Plaintiffs reserve the right to allege other violations of law, which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date. Unless restrained and enjoined, Defendants will continue to engage in the unlawful conduct described herein.

210. Defendants' representations or omissions were misleading to Plaintiffs and Class members, who reasonably relied upon them.

211. The harm to Plaintiffs and the Class greatly outweighs any public utility of Defendants' conduct. This injury was not outweighed by any countervailing benefits to consumers and competition and could not have been reasonably avoided by Plaintiffs and the Class. Defendants

violated established public policy and engaged in immoral, unethical, oppressive, unscrupulous, and substantially injurious conduct.

212. Defendants' violations caused Plaintiffs and Class members to suffer ascertainable losses and actual damages as a direct and proximate result of Defendants' actions and omissions.

213. Defendants' violations present a continuing risk to Plaintiffs and the Class, as well as to the general public. Defendants' unlawful acts and practices alleged herein affect the public interest.

214. Plaintiffs request that the Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing to engage in unfair, unlawful, and/or deceptive practices and to restore to members of the Class any money they acquired by law violations, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203; for attorneys' fees and costs under Cal. Code Civ. Prac. § 1021.5; and for such other relief as set forth herein.

215. Plaintiffs plead this claim separately as well as in the alternative to their claims for damages and other relief under Federal Rule of Civil Procedure 8(a)(3). To the extent Plaintiffs seek equitable relief, Plaintiffs lack an adequate remedy at law, and equitable and injunctive relief is necessary because Defendants' violative conduct is ongoing and is continuing to cause harm to the public. Such injunctive relief could several forms, including: (i) requiring Defendants to remove all ads and interruptions from YouTube Premium; and/or (ii) requiring Defendants to truthfully market YouTube Premium as having ads and interruptions.

**THIRD CAUSE OF ACTION**

**VIOLATION OF THE CONSUMERS LEGAL REMEDIES ACT ("CLRA")**

**(Cal. Civ. Code §§ 1750, *et seq.*)**

216. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

217. This Claim is brought on behalf of the Nationwide Class and the California Class, referred to in this section collectively as the "Class."

218. Plaintiffs and members of the Class are "consumers," as that term is defined by Civil Code § 1761(d).

219. Plaintiffs and Class members have engaged in "transactions" with Defendants, as that term is defined by Civil Code § 1761(e).

220. Plaintiffs and the Class purchased "goods" and/or "services" from Defendants as defined in Cal. Civ. Code § 1761(a), (b).

221. The conduct alleged herein was undertaken by Defendants in transactions intended to result in, and which did result in, the sale of goods and/or services to consumers.

222. The conduct alleged herein constitutes unfair methods of competition and unfair or deceptive acts or practices for purposes of the CLRA.

223. By engaging in the conduct described herein, Defendants, individually and collectively, have violated California Civil Code § 1770 in at least the following ways:

a. By "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have;"

b. By "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and

c. By "[a]dvertising goods or services with intent not to sell them as advertised."

224. Defendants, individually and collectively, violated the CLRA by representing to Plaintiffs that YouTube Premium streaming services are "ad-free" and that streaming content is available without interruption. But these representations are false, as members such as Plaintiffs and the Class are subjected to advertisements and interruptions.

225. Defendants' representations were likely to deceive, and did deceive, Plaintiffs and reasonable consumers. Defendants knew or should have known that their representations are misleading to reasonable consumers.

226. Defendants' representations were intended to induce reliance, and Plaintiffs and the Class reasonably relied upon them. Defendants' representations were a substantial factor in Plaintiffs' and the Class's purchase decisions.

227. Defendants' violations of the CLRA proximately caused injury in fact to Plaintiffs and the Class.

228. On July 29, 2026, Plaintiffs provided the pre-suit notice contemplated by the CLRA. A true and correct copy of that notice is attached to this Complaint as **Exhibit A**. Defendants did not substantively respond to the notice and did not materially modify its operations to cure the deficiencies identified in the notice.

229. Defendants continue to violate the CLRA and continue to injure the public by misleading consumers about their goods and services.

230. Plaintiffs seek all available remedies under the CLRA, including monetary relief for actual, punitive, and statutory damages.

231. Plaintiffs and Class members suffered monetary harm as a result of Defendants' conduct because (a) they would not have purchased the services on the same terms had it not been for Defendants' unlawful, unfair, and deceptive actions as set forth herein; and/or (b) they paid a price premium for the services or chose them over competing services due to Defendants' marketing misrepresentations, as discussed herein.

232. Pursuant to Cal. Civ. Code § 1782(d), Plaintiffs, individually and on behalf of the Class and general public, seek a Court order enjoining the above-described wrongful acts and practices of Defendants.

**FOURTH CAUSE OF ACTION**

**VIOLATION OF FLORIDA'S UNFAIR AND DECEPTIVE TRADE PRACTICES ACT ("DTPA")**

**(Fla. Stat. § 501.201 *et seq.*)**

233. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of the Complaint.

234. This claim is brought on behalf of the Florida Class.

235. Plaintiff Justin DiPentima and members of the Florida Class are "consumers" within the meaning of the DTPA. Fla. Stat. § 501.203(7).

236. Defendants engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

237. The DTPA prohibits "[u]nfair methods of competition, unconscionable acts or

practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

238. Defendants participated in unfair and deceptive trade practices that violated the DTPA by engaging in deceptive acts or practices, including, but not limited to, misrepresenting that YouTube Premium service was "ad-free" and that streaming content would be provided without interruption by advertisements. These misrepresentations would be material to a reasonable consumer.

239. Defendants' actions, as set forth herein, occurred in the conduct of trade or commerce.

240. Defendants' misrepresentations were knowing and systematic; they knew that YouTube Premium service was not ad-free and that content was not presented without interruption by advertisements, yet Defendants concealed these facts to lure in more Premium members.

241. In the course of business, Defendants willfully failed to disclose and actively concealed that Premium service is not ad-free and content is not presented without interruption.

242. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff DiPentima and members of the Florida Class, about the true nature of YouTube Premium streaming service.

243. Because Defendants unreasonably misrepresented the nature of YouTube Premium streaming service, Plaintiff DiPentima and members of the Florida Class were deprived of the benefit of the bargain, overpaid for services that were not provided, and were delivered a service that was unsatisfactory.

244. Plaintiff DiPentima and members of the Florida Class are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.210(1).

245. Plaintiff DiPentima and members of the Florida Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the DTPA.

**FIFTH CAUSE OF ACTION**

**UNJUST ENRICHMENT**

246. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

247. This Claim is brought on behalf of the Nationwide Class under California law or, in the alternative, on behalf of the California Class and Florida Class under California and Florida law, respectively.

248. Plaintiffs and Class members conferred a monetary benefit on Defendants when they paid monthly subscription fees to obtain YouTube Premium's "ad-free" streaming services, but YouTube Premium did not provide "ad-free" streaming services as represented.

249. Defendants appreciated or had knowledge of the benefits conferred upon them by Plaintiffs and Class members.

250. As a result of Defendants' conduct, Plaintiffs and Class members suffered actual damages in an amount equal to the monies paid to obtain YouTube Premium streaming services.

251. Under principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiffs and Class members because Defendants have obtained that money through misrepresentations and omissions.

252. Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds received through the false and/or misleading advertising scheme described herein.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the members of the Class, respectfully request that the Court:

a. Certify this case as a class action, designating Plaintiffs as class representatives and designating the undersigned as Class Counsel;

b. Declaring that Defendants' conduct violates the statutes set forth above;

c. Award Plaintiffs and the Class actual damages in an amount according to proof;

d. Award Plaintiffs and the Class restitution in an amount to be proven at trial;

e. Award Plaintiffs and the Class punitive damages in an amount to be proven at trial;

f. Award Plaintiffs and the Class pre-judgment interest in the amount permitted by law;

g. Award Plaintiffs and their attorneys fees and costs as permitted by law;

h. Declare Defendants' practices outlined herein to be unlawful;

i. Enjoin Defendant from engaging in the practices outlined herein;

j. Grant Plaintiffs and the Classes a trial by jury;

k. Grant leave to amend these pleadings to conform to evidence produced at trial; and

l. Grant such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs, by counsel, demand trial by jury.

Dated: November 20, 2026

Respectfully submitted,

*/s/ James Bilsborrow*

James Bilsborrow (admitted *pro hac vice*)
Michael Piggins*
Ashley Arraras*
**WEITZ & LUXENBERG, PC**
700 Broadway
New York, New York
Telephone: (212) 558-5500
jbilsborrow@weitzlux.com
mpiggins@weitzlux.com
aarraras@weitzlux.com

Devin Bolton (SBN 290037)
**WEITZ & LUXENBERG, PC**
1880 Century Park East, Suite 700
Los Angeles, California 90067
Telephone: (310) 247-0921
dbolton@weitzlux.com

Matthew W. Broughton*
Andrew M. Bowman*
Jared A. Tuck (admitted *pro hac vice*)
**GENTRY LOCKE ATTORNEYS**
10 Franklin Rd. SE, Suite 900

Roanoke, Virginia 24011
Phone: (540) 983-9300
Fax: (540) 983-9400
broughton@gentrylocke.com
bowman@gentrylocke.com
jtuck@gentrylocke.com

* *Pro Hac Vice* applications to be submitted

*Counsel for Plaintiffs and the Proposed Classes*